**William M. MALONEY, Plaintiff,**

v.

**Harold WASHINGTON, et al.,
Defendants.**

**Joseph HAUGHEY, et al., Plaintiffs,**

v.

**Harold WASHINGTON, et al.,
Defendants.**

**Nos. 84 C 689, 85 C 1905.**

United States District Court,
N.D. Illinois, E.D.

July 13, 1988.

Edward R. Theobald, Chicago, Ill., for plaintiffs.

Matthew J. Piers, Locke E. Bowman, Elizabeth B. Kuoni, and Phillip H. Snelling, Asst. Corp. Counsel, Chicago, Ill., for defendants.

### MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

In these two cases consolidated for trial, four white Chicago police officers have sued the City of Chicago, the estate of former Mayor Harold Washington, former Chicago Police Department Superintendent Fred Rice, and Edwin Bishop, Executive Assistant to the Superintendent of Police. The plaintiffs had been elevated to the exempt ranks of the police department under former Superintendent Richard J. Brzeczek and had held the following positions:

| | |
|---|---|
| Joseph C. Haughey | — Executive Assistant to the Superintendent |
| William M. Maloney | — Coordinator of the joint drug task force of the City of Chicago and the United States Drug Enforcement Agency |

Daniel P. O'Sullivan and — Attorneys in the Legal
Russell J. Luchtenberg       Affairs Department of
                             the police force.

Shortly after Mayor Washington was elected in November 1983 and his subsequent appointment of Fred Rice as Superintendent of the Chicago Police Department, the plaintiffs were removed from the exempt ranks and reassigned to positions within the department consistent with their career service ranks. All four claim that such action constituted a racially and politically motivated demotion. In essence, the four white officers claim discrimination by the newly elected black administration of the City of Chicago—a claim hotly contested by the defendants.

This court has presided over two aborted efforts to try this controversy. In February 1988, a jury was empaneled and testimony taken for approximately two weeks before we granted plaintiffs' motion for a mistrial arising out of certain testimony by former Superintendent Rice. In early July 1988, nine jurors (including three alternates) were selected by the parties. However, we refused to empanel the nine venire members because we concluded that the jury selection process had been tainted by the plaintiffs' use of their peremptory challenges to exclude members of the black race. Instead, we stayed the commencement of the retrial until July 15 in order to permit the plaintiffs to seek a writ of mandamus from the Seventh Circuit Court of Appeals compelling us to empanel this jury.[1] We informed the nine venire members selected that the trial had been delayed, and instructed them to avoid all publicity about the trial. We further ordered that in the event the writ of mandamus was not granted by the Seventh Circuit, a new jury would be selected at a later date and neither side would be permitted any peremptory challenges. The court's rationale is set forth in its oral decision from the bench on July 7. However, because those findings were made under significant time constraints and were necessarily brief,

we now set forth a more detailed basis for the decision.

## DISCUSSION

Plaintiffs claim they were removed from the exempt ranks by Superintendent Rice with the advice and consent of Mayor Harold Washington because they are white and because they had supported the candidacy of Jane Byrne in the 1983 Democratic mayoral primary. Given the nature of their case, plaintiffs have apparently concluded that they would prefer to have their case tried by members of their own race. During the selection of the first jury in February, the plaintiffs used all four of their peremptory challenges against blacks. It is the court's recollection that no blacks were accepted on the first jury until the plaintiffs had exhausted all of their challenges. The defendants, meanwhile, appeared intent on seating as many black jurors as possible and, accordingly, aimed all four of their peremptory challenges at whites. Because the venire contained a substantial number of both black and white citizens, neither side was successful in excluding members of the opposite race and the final jury (including alternates) contained five whites and five blacks. The court was concerned about the mandate of the Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) throughout the selection of the first jury, but proceeded to trial given the parties' respective lack of success in excluding members of a particular race from the panel.[2]

Prior to beginning the retrial, this court advised counsel for both sides that the holding in *Batson* would be applied during the selection of the second jury and that the plaintiffs would be required to justify their use of peremptory challenges against blacks and the defendants their use of peremptories against whites. Despite the court's admonition, the plaintiffs exercised

---

**1.** July 15th was chosen because the trial is expected to last one month. Further delays in the trial would likely mean that several of the jurors already selected would be unable to serve.

**2.** It appeared increasingly clear during the two weeks of trial that plaintiffs were unhappy about the racial composition of the jury; plaintiffs made daily motions for mistrials, many of which were frivolous.

three of their peremptory challenges against blacks, and the city exercised their four peremptory challenges exclusively against whites. The plaintiffs allowed only one black prospective juror to survive its challenges. The group ultimately selected consisted of five whites and one black.[3] (The three individuals chosen as alternates were also white.) This court has refused to empanel this jury.

In this civil case involving "reverse discrimination," the parties' statutory right to peremptory challenges in the selection of their jury has in our view come into conflict with *Batson* and the Equal Protection Clause of the United States Constitution. Such a conflict must be resolved in favor of the Constitution. In so holding, we have concluded that the Supreme Court's decision in *Batson* applies with equal force and effect to jury selection in civil cases and to all the parties in those cases, whether state actors or not. We have also determined that the plaintiffs failed to justify their use of peremptory challenges on nonracial grounds as required by the Supreme Court's holding in *Batson*.

In *Batson*, the United States Supreme Court held that the use of peremptory challenges by a prosecutor to exclude members of the black race from a jury in a criminal case deprived both the black defendant and the excluded jurors of equal protection of law. In so holding, the Supreme Court stated that:

> [T]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermines public confidence in the fairness of our system of justice. Discrimination within the judicial system is most pernicious 'because it is a stimulant to that race prejudice which is an impediment to se-

curing to [black citizens] that equal justice which the law aims to secure to all others.' (Citations omitted.)

*Batson*, 476 U.S. at 87–88, 106 S.Ct. at 1718 (quoting *Strauder v. West Virginia*, (10 Otto) 100 U.S. 303, 308, 25 L.Ed. 664 (1880)). Thus, the Supreme Court concluded that the Equal Protection Clause forbids a prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable to impartially consider the state's case against a black defendant.

■ We recognize, as we must, that the Supreme Court's decision in *Batson* was necessarily limited to the facts before it— the discriminatory use of peremptories by a prosecutor against a black defendant in a criminal case. The case before this court is arguably different. First, it is a civil rather than a criminal case, and second, the use of peremptories to exclude black citizens was undertaken by private plaintiffs, not a governmental entity. In *Batson*, the Supreme Court expressed no view on whether its prohibition against the use of peremptory challenges based on race extended to defense counsel. 476 U.S. at 89, n. 12, 106 S.Ct. at 1719 n. 12. For the reasons set forth below, we now conclude that the rationale of *Batson* applies with equal force to all litigants.

Peremptory challenges are by definition arbitrary and until *Batson* had, as a practical matter, been left to the discretion of the trial lawyer. But as noted by the Supreme Court, they permit "those to discriminate who are of a mind to discriminate." *Id.* 476 U.S. at 96, 106 S.Ct. at 1722–1733 (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892–893, 97 L.Ed. 1244 (1953)). Accordingly, the Supreme Court found constitutionally impermissible a prosecutor's use of peremptory challenges when that use is designed to practice racial discrimination. The Court's finding rested

**3.** The plaintiffs did use two peremptory challenges against white alternates. However, we note that no blacks were included among the potential alternates being considered, and that plaintiffs' action came only after the court again advised the parties that it perceived that peremptories were being used to exclude people on

the basis of race. Given these circumstances, we concluded that plaintiffs' use of these peremptories against whites—after the six person jury was chosen—was designed to create the illusion that plaintiffs' peremptories were not being used to discriminate on racial grounds.

on the Equal Protection Clause of the fourteenth amendment which applies equally to criminal and civil cases. *See Thiel v. Southern Pacific Co.*, 328 U.S. 211 (1946).

Discrimination deprives both a party and the prospective juror of equal protection of law. Such reasoning cannot, in this court's view, be rationally limited to criminal cases. At least one district court has so held. In *Clark v. City of Bridgeport*, 645 F.Supp. 890 (D.Conn.1986), racial discrimination by the state in the selection of a petit jury in a civil case resulted in dismissal of that jury. The court found that to act otherwise would sanction a practice which undermines the integrity and public trust in the judicial system. We agree. Jury service is both a responsibility and privilege of all citizens. Discrimination in the selection of jurors in a United States District Court is anathema to a court sworn to uphold the Constitution. Congress has recognized as much in 28 U.S.C. § 1862, which provides that no citizen shall be excluded from service as a juror on account of race. While this statute pertains to the selection of the entire venire, its underlying policy favors insuring the selection of petit juries free from discrimination as well. H.R.Rep. No. 1076, 90th Cong. 2d Sess.; *see Clark*, 645 F.Supp. at 896. It is hard to imagine any rational basis for forbidding discrimination in the selection of the entire venire while permitting it in the selection of a petit jury. Accordingly, we respectfully disagree with the dicta in *Wilson v. Cross, et al.*, 845 F.2d 163, 164–65 (8th Cir.1988), in which the Eighth Circuit expressed strong doubts about whether *Batson* was intended to limit the use of peremptory strikes in civil cases. We conclude that the Equal Protection Clause and *Batson* make the use of racially motivated peremptory challenges in civil cases constitutionally impermissible.

While it is true that equal protection guarantees are limited to governmental actions, we find that the private plaintiffs' attempted use of the powers of a federal court implicates the Equal Protection Clause. The Supreme Court held in *Lugar v. Edmondson Oil*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), that a private party's use of a court's power can, in some circumstances, constitute governmental action. *Cf. New York Times v. Sullivan*, 376 U.S. 254, 265, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964) (private party's invocation of state law in a state court proceeding which imposes invalid restrictions on constitutional freedoms constitutes exercise of state powers); *see also Holley v. J & S Sweeping Co.*, 143 Cal.App.3d 588, 192 Cal.Rptr. 74 (1st Div.1983) (California constitution prohibits use of peremptory challenges in a discriminatory fashion by private litigants).

Here the plaintiffs seek to secure rights guaranteed to them under federal law by invoking the jurisdiction of the United States District Court. We will not permit our power under Article III of the Constitution to be used to sanction such discriminatory conduct. As one court recently stated, "[T]he appearance of justice is not fulfilled if the trial court acquiesces in, condones or fails to preclude attempts by the prosecuting attorney to exclude blacks from the jury solely because they are black. The trial court cannot sit idly by in such instances and become an accomplice to racial discrimination in the courtroom. Rather, it must insure that justice prevails and that the appearance of justice is demonstrated in the trial that is taking place before those in attendance." *People v. Andrews*, 172 Ill.App.3d 394, 122 Ill.Dec. 369, 526 N.E.2d 628 (1st Dist.1988). White plaintiffs who seek redress for alleged discriminatory practices by black city officials cannot be themselves permitted to discriminate against prospective black jurors who are fully qualified to decide this controversy.

■ We now turn to the question of whether the plaintiffs indeed exercised their peremptory challenges in a systematic effort to exclude members of the black race. In doing so, we consider the use of peremptory challenges in the selection of both juries in this case. Given the plaintiffs' use of challenges in the first trial (all four directed at blacks) and the three (out of the three utilized) peremptories against blacks in the selection of the second jury, we asked plaintiffs' counsel to justify the latter strikes on non-racial grounds. We find plaintiffs' counsel has failed to do so.

We will discuss each black prospective juror excused by the plaintiff at the second trial individually.

*Black Prospective Juror No. 1* was excused by the plaintiff because she worked for the Urban League of Chicago. Plaintiffs suggested that such employment would indicate that this prospective juror was interested in helping minorities and was therefore partial to blacks. Plaintiffs' challenge was made despite the fact that this prospective juror testified that she believe the work of the Urban League was to help all disadvantaged people regardless of race and despite the fact that she indicated that she could be color blind in deciding the case. We found the prospective juror to be completely unbiased, yet acknowledged that plaintiffs may have had a good faith basis for challenging this prospective juror based on her affiliation with the Urban League.

*Black Prospective Juror No. 2* was excused by the plaintiffs on the grounds that she had been a temporary employee of the Chicago Police Department for six months several years earlier. Plaintiffs suggested a possibility that her supervisor might be a witness for the plaintiffs. We find this attempted justification specious. Since police officers are involved on both sides of this litigation, that Prospective Juror No. 2 formerly worked for the police department in itself means nothing. She testified she had never heard of the "supervisor" and nothing suggests that this supervisor had any relevant testimony in this trial. We found this juror to be without any bias after substantial questioning by both the court and the parties.

*Black Prospective Juror No. 3* was excused by plaintiffs on the grounds she had "lied" about having any prior trouble with the law. On her questionnaire, she indicated she had no prior arrests. During questioning by the court, however, she volunteered that she had been arrested for disorderly conduct during a dispute in the street and later fined $25. Though plaintiffs cited this discrepancy as their reason for challenging this juror,

we find this justification to be pretextual; plaintiffs had accepted several white jurors who had similarly been mistaken about answers in the questionnaire and who had likewise amended those answers under questioning by the court. Again, Prospective Juror No. 3 had demonstrated a complete absence of bias under careful scrutiny.

In sum, we find that at least two of plaintiffs' three peremptories at the second trial were used to exclude members of the black race soley because of their race. Moreover, plaintiffs permitted only one prospective black juror to survive their use of peremptories in the two selection processes combined, and they never used a peremptory challenge in either trial to strike a prospective white juror from the panel of six which would decide the case. We find that the plaintiffs have ignored this court's admonition that racial discrimination in the jury selection process will not be tolerated.

In reaching our conclusion, we are not troubled by the fact that the plaintiffs did permit one black prospective juror to survive the second selection process. As stated in *People v. Andrews,*

> However, merely because two blacks were seated on the jury is not sufficient to prevent or defeat the establishment of a prima facie case of racial discrimination. The affirmative racial exclusion of available black jurors by the State which results in only one or two blacks being seated on the jury is no less evil and no less constitutionally prohibited than the same procedure which results in the total exclusion of blacks. No available black person should be excluded either singularly or systematically from being a juror solely because he or she is black.

The defendants fare only slightly better. All of their peremptory challenges were used against whites in both trials. However, they did permit some whites to survive their strikes—probably because it was impossible, given the composition of the second venire (35 whites, 13 blacks, 1 Hispanic), to strike all of the white people. We further find the attempted justifica-

tions for the defendants' use of their peremptories to be less than satisfactory.

For these reasons, we concluded that racial discrimination permeated the jury selection process. Because plaintiffs had actually been successful, on the whole, in excluding black people from service, we refused to empanel the jury. We also found that because both sides had twice used their challenges almost exclusively along racial lines—the second time in violation of the court's clear admonition—their right to make peremptory challenges has been lost. Therefore, we have decided to eliminate the use of peremptory challenges in the next selection of the jury. We have done so as a sanction because we believe both sides have consistently ignored the court's orders to select a jury without considering race, and because it will be the most effective means of ensuring an unbiased jury selection process.