**Reather REYNOLDS, as Administratrix of the Estate of John Willie Reeves, deceased, and in her own behalf, Appellant,**

v.

**CITY OF LITTLE ROCK; Walter E. "Sonny" Simpson; E.H. "Doc" Hale; Lieutenant Joe Thomas; and Sergeant Brad Furlow of the Little Rock Police Department, each and all in their official and personal capacities; Lottie L. Shackleford; J.W. "Buddy" Benafield; Sharon Priest; Tom Milton; Charles Bussey; Thomas Prince; and F.G. "Buddy" Villines, individually and in** their personal and official capacity as elected members of the Little Rock City Board of Directors, Appellees.

No. 88–2540.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1989.

Decided Jan. 12, 1990.

Perlesta A. Hollingsworth, Little Rock, Ark., for appellant.

Ms. Victra L. Fewell, Little Rock, Ark., for appellees.

Before ARNOLD, Circuit Judge, ROSS, Senior Circuit Judge, and CAMBRIDGE,* District Judge.

ARNOLD, Circuit Judge.

John Willie Reeves, a mentally disturbed black man, was killed by gunfire from several members of the Little Rock Police Department as he advanced toward a police officer waving a pocket knife. Reather Reynolds, as administratrix of Reeves's estate, brought this action under 42 U.S.C. § 1983 against the City of Little Rock, members of the City Board of Directors, and members of the Little Rock Police Department. Reynolds's complaint alleged that the police officers used excessive force in shooting Reeves, and that the City had fostered this alleged constitutional deprivation by failing to enforce adequate standards for the use of deadly force. The jury found for the defendants. On appeal, Reynolds urges that the District Court erred in excluding certain evidence and in commenting on the testimony of Reynolds's expert witness. We affirm the District Court on these issues.

Reynolds further argues that the City Attorney's use of peremptory strikes to remove the two black members of the ve-nire constituted purposeful discrimination prohibited by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We agree that a state actor may not exercise peremptory challenges with the intent to exclude black people from the jury, whether in a criminal or a civil trial. We conclude that *Batson* applies to the conduct of a governmental litigant in a civil trial, and so we vacate the District Court's judgment insofar as it incorporates the City's position that it need not account for the exercise of its peremptories in a civil trial. On remand, the District Court should conduct further proceedings in accordance with this opinion.

I.

On the evening of October 9, 1984, police officers arrived at an auto parts store to investigate a burglar alarm. An attendant at a nearby service station told the officers that someone had pulled a knife. The officers then spotted John Willie Reeves, the man described by the attendant, and pursued him. Reeves fled, periodically waving a pocket knife at the officers. One officer determined at the time that Reeves was irrational and apparently mentally ill. The police, at this time numbering up to eight officers, finally surrounded Reeves, who continued to wave his knife, telling the police to get away. As one officer approached Reeves to subdue him, Reeves advanced, wildly swinging his knife. Several officers opened fire with revolvers and a shotgun, killing Reeves instantly.

At trial, Reynolds argued that the police use of deadly force in this situation was an unconstitutional deprivation of Reeves's rights, under the theory of deliberate indifference, see, e.g., *Herrera v. Valentine*, 653 F.2d 1220, 1229 (8th Cir.1981). Reynolds further claimed that the City was liable for this constitutional tort through its failure to enforce adequate standards for the use of deadly force, citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). At trial, Reynolds

---

* The Hon. William G. Cambridge, United States District Judge for the District of Nebraska, sit-ting by designation.

sought to introduce Little Rock Police Department investigative files on previous incidents of the use of deadly force. The District Court sustained the City's objection to the admission of the files, on the ground that the files were mostly hearsay and irrelevant.

Reynolds's expert witness, Dr. James Fyfe, testified at length about the literature on and developing standards for the use of deadly force. After overruling a City objection to Dr. Fyfe's testimony, the Court commented:

THE COURT: Well, let's get down to the meat in the coconut. [Dr. Fyfe has] been sitting here the entire trial and has heard it all, so let's get down to this case and get his opinion on the handling of this particular case ... What I'm interested in hearing from this witness, as far as the jury is concerned, is what he thinks that the police department did wrong in this case. That's what we're trying to get to here.

Tr. 276. On direct examination, Dr. Fyfe proceeded to testify about emerging national standards of police use of force, when the Court interjected:

THE COURT:. What standards are we talking about here? I mean, what particular standards are you talking about? This witness has been qualified as an expert and, you know, when you talk about standards as far as the standards in machine manufacturing, there are organizations that put out standards. I mean, he was very vague about standards but what—he's been qualified as an expert. What I'd like to do rather than talking about some vague standards, which as I understand his testimony, consists of everything from decisions of the Supreme Court on down to things that have been promulgated by the FBI Academy, by the International Association of Chiefs of Police. But what I would like for you to do and what I think is proper is to get down to this case and let's have him tell what—where in his opinion the police did not handle this properly. I mean, he's been qualified. His qualifications have been admitted as an expert. But, now, we're talking about some kind of vague standards. We're talking about abstractions and standards that haven't been really identified. We don't know what they are. But let's get down to his opinion about what happened in this case. That's the issue.

Tr. 279–80. At this point, counsel for Reynolds requested a bench conference, at which counsel objected to the District Court's comments in the presence of the jury concerning Dr. Fyfe's testimony.

After a three-day trial, the six-member jury returned a verdict for the defendants. The jury had been given five interrogatories, the first of which asked:

Do you find from a preponderance of the evidence that the officers of the Little Rock Police Department used excessive force in attempting to effect the arrest of Willie Reeves, which proximately resulted in his death?

Answer—No.

The remaining four interrogatories probed the liability of the City and each of three police officers for negligent supervision of the officers firing the fatal shots. The jury found no liability for each of the defendants.

After the selection of the jury, counsel for Reynolds noted that all the blacks on the jury panel had been struck, including two excused by the City's peremptory challenges. The District Court offered the City's counsel an opportunity to explain those challenges, but the City's counsel stood firm on the position that the City was under no obligation to justify its exercise of peremptory strikes in a civil case.

## II.

■ We turn first to Reynolds's objection to the District Court's exclusion of LRPD investigative files on previous instances of deadly force. All parties agree that, in general, evidence of prior incidents of deadly force may be necessary to prove the existence of a policy or custom of unconstitutional conduct. Such evidence, however, is circumscribed by the normal

evidentiary rules concerning relevance and hearsay.

In this case it is not necessary to consider whether the District Court properly excluded the investigative files. Such evidence, if admitted, would tend to show only that the City was negligent in training its officers, and might therefore be liable under *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and *Oklahoma v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), for any constitutional violation committed against John Willie Reeves. The necessary predicate for liability of the City and individual supervisors, however, is a finding that the LRPD officers who shot Reeves used excessive force under the circumstances. The jury specifically rejected this allegation in answering Interrogatory No. 1. As a result, the jury found that no constitutional violation had occurred in Reeves's case. Where there is no underlying constitutional violation, the presence or absence of policies which permit the use of excessive force "... is quite beside the point." *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (per curiam). We conclude that the jury's finding that Reeves was not the victim of constitutionally excessive force robs the issue of the City's overall, deadly-force policy of any further meaning. Even if Reynolds were correct that the excluded files should have been admitted, their admission would not have changed the result, in light of the jury's answer to Interrogatory No. 1.[1]

### III.

■ We turn next to Reynolds's objection to the District Court's remarks concerning Dr. Fyfe's testimony. Reynolds argues that the District Court's remarks

hopelessly undermined her ability to show that Reeves's killing was unnecessary. We disagree. Reynolds quotes extensively from comments made by the District Court during the bench conference, but we must assume such remarks were made out of the hearing of the jury. The District Court's only comments heard by the jury characterized Dr. Fyfe's reference to national standards as "vague" and "abstractions," and urged counsel to "get down to his opinion about what happened in this case." In context, the District Court's comments did not impugn the reliability of Dr. Fyfe's testimony, but merely prodded counsel to direct the testimony toward the facts of Reeves's death. Furthermore, Reynolds was given full opportunity after the District Court's admonitions to examine Dr. Fyfe on the specific facts of Reeves's death. Tr. 282, *et seq.*

The District Court should carefully refrain from making comments that might prejudice a litigant in the eyes of the jury. See *Coast–to–Coast Stores, Inc. v. Womack–Bowers, Inc.,* 818 F.2d 1398, 1401 (8th Cir.1987). On the other hand, the Court has a right to make judicious comments on the evidence, and sometimes such comments can be significantly helpful in focusing the issues. In this case the prejudicial effect of the District Court's remarks was non-existent or minimal, and the Court's comments are less troublesome than those we held non-prejudicial in *Van Leirsburg v. Sioux Valley Hospital,* 831 F.2d 169, 172–73 (8th Cir.1987). We conclude that Reynolds was not prejudiced by the District Court's comment.

### IV.

■ Finally, we turn to the City's exercise of its peremptory challenges to excuse

---

1. Because of our remand on the *Batson* issue, it is possible that a new trial will be necessary. If so, the question of the admissibility of the investigative files may recur. Issues of the admissibility of evidence are addressed to the sound discretion of the district courts and may be heavily influenced by the particular factual context in which they arise. We cannot know at this point the specific factual context in which any such issue might arise at a second trial.

For the guidance of the parties and the District Court, however, we observe that we see no abuse of discretion in the action taken by the Court at the trial we are now reviewing. The facts of two previous incidents were before the jury in some detail. The actual investigative files are voluminous and contain a good deal of hearsay. In these circumstances, we see no error in the District Court's ruling refusing to admit them into evidence.

the two remaining black people on the jury panel. After Reynolds's counsel complained about this result to the District Court, the Court gave the City's attorney an opportunity to explain his choices on the record. The City's attorney declined to explain, asserting that "we do not have to justify the use of peremptories in a civil case of this manner." Tr. 26.

The City's attorney's position resembles the claim defended by the Attorney General of Kentucky and rejected by the Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson*, the Court held that "... the State's privilege to strike individual jurors through peremptory challenges[ ] is subject to the commands of the Equal Protection Clause." 476 U.S. at 89, 106 S.Ct. at 1719 (footnote omitted).

The City argues that the rule in *Batson* does not apply in this case because *Batson* involved a criminal prosecution, while here the City is defending a civil suit. The City reasons that since *Batson* is concerned with a criminal defendant's right to an impartial jury, *Batson* involves only Sixth Amendment protections for criminal defendants, and should not be extended to the Seventh Amendment's provisions for civil juries.

We find this distinction unpersuasive. It is certainly true that *Batson* was a criminal case governed by the Sixth Amendment. However, the Court explicitly declined to discuss the merits of Batson's Sixth Amendment arguments, and instead focused exclusively on the application of equal-protection principles. 476 U.S. at 84–85 n. 4, 106 S.Ct. at 1716–1717 n. 4. Unlike the Sixth Amendment, the Equal Protection Clause of the Fourteenth Amendment does not contain any latent distinctions between criminal and civil legal process.

The distinction that is crucial for application of equal-protection principles is that between governmental actors and private actors. This distinction explains the Court's reasoning in *Batson* far better than the differences between criminal and civil cases. The *Batson* Court specifically declined to formulate any limit on the exercise of peremptory challenges by defense counsel, 476 U.S. at 89 n. 12, 106 S.Ct. at 1719 n. 12. If the City's rationale were correct that *Batson*'s applicability depends on the type of case, rather than the governmental affiliation of the party exercising peremptory challenges, then criminal defense counsel would confront the same limits on their peremptory challenges as prosecutors. The more natural reading of *Batson* is that its rule of non-discrimination applies only to governmental actors, without distinguishing criminal and civil legal proceedings.[2]

We conclude that the actions of government counsel in purposefully removing black jurors through peremptory challenges violates the Equal Protection Clause, whether the exclusion occurs in a criminal or a civil case. " 'Whoever, by virtue of a public position under a State government, ... denies or takes away the equal protection of the laws ... violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State.' " *Columbus Board of Education v. Penick*, 443 U.S. 449, 457 n. 5, 99 S.Ct. 2941, 2946 n. 5, 61 L.Ed.2d 666 (1979) (quoting *Ex Parte Virginia*, 100 U.S. 339, 347, 25 L.Ed. 676 (1880)). This principle does not evaporate when a government lawyer represents his client in

---

**2.** In *Edmonson v. Leesville Concrete Co.,* 860 F.2d 1308 (5th Cir.1988), *vacated by order granting rehearing en banc,* 860 F.2d 1317 (5th Cir. 1989), Judge Rubin wrote for a divided panel that the Fourteenth Amendment is violated when a judge must enforce a private litigant's racially motivated peremptory challenges: "The government is inevitably and inextricably involved as an actor in the process by which a federal judge, robed in black, seated in a paneled courtroom, in front of an American flag, says to a juror, 'Ms. X, you are excused.' " 860 F.2d at 1313. We agree with Judge Rubin that the focus of the equal-protection analysis in *Batson* is on the presence of governmental action with a racially discriminatory purpose. See *Batson, supra,* 476 U.S. at 93–94, 106 S.Ct. at 1721–1722. We express no view on whether the action of the court alone, in a case involving no governmental litigants, can supply the necessary element of governmental action.

a civil suit. Significantly, the *Batson* Court's discussion of the evidentiary standards for proving purposeful governmental discrimination relies mainly on cases involving the civil liability of governments in constitutional cases, *e.g., Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

The most obvious difference between a prosecutor and a city lawyer in a § 1983 action is that a state prosecutor threatens a private defendant with loss of life or liberty, while the government lawyer in a civil suit seeks only to deny the private adversary a judgment. This difference of degree is not relevant in the present context. The equal-protection cases cited in *Batson* applied the Fourteenth Amendment to both civil and criminal trials. These cases, like *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880), and *Carter v. Jury Commission of Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), generally involve attacks on discriminatory jury-selection schemes which affected civil and criminal juries alike. The cases stress that the private parties are not the only victims of racial discrimination on juries. Excluded jurors are as aggrieved as those tried by juries chosen under a system of racial exclusion. See *Carter*, 396 U.S. at 329, 90 S.Ct. at 523; *Batson*, 476 U.S. at 87, 106 S.Ct. at 1718. The *Carter* Court compared the discriminatory exclusion from jury service to the denial of the elective franchise. A juror is a public official, in fact a judge, pro tempore. He or she exercises governmental power. No one may be excluded from such an office by official racial discrimination. 396 U.S. at 330, 90 S.Ct. at 523. And, as the *Batson* Court stressed, "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." *Batson*, 476 U.S. at 87, 106 S.Ct. at 1718.

These considerations apply as much in a civil suit against a governmental entity as to a government prosecution of an individual. In this case, a jury has had to arrive at a judgment in a traumatic episode of a police shooting of a disturbed black man. The community—particularly the black community—has an interest in ensuring that the government has not purposely excluded black people from the jury, as much as though Willie Reeves had survived the event and now stood trial for the crime of assault. We conclude that the City Attorney did have an obligation to justify his use of peremptories in this civil case.

The City argues further that since the police-officer defendants were sued in both their official and individual capacities, the City Attorney's exercise of peremptory challenges on their behalf was not government action. We disagree. The City cannot exempt itself from the Equal Protection Clause simply because its counsel also represents individuals. If the police officers sued individually had been separately represented, and their lawyer had exercised the peremptory challenges at issue, a different question might be presented. We need not answer that question now.

Finally, the City argues that Reynolds's objection to its exercise of peremptories was untimely and equivocal in that the objection was phrased only as an "observation," and came only after the jury had been sworn. Here, the District Court accepted counsel's complaint as an objection, and clearly told both parties that the objection called for a response. Tr. 24–25. If the objection was clear and timely enough for the District Court, we will not bar Reynolds's appeal on this ground.

We therefore vacate the judgment of the District Court insofar as it adopts the position that the City need not explain its peremptory challenges against black jurors. On remand, the District Court should first determine whether plaintiff has made a prima facie case of discrimination. If it finds that a prima facie case has been made out, it should then conduct a hearing pursuant to the evidentiary standards articulated in *Batson*, 476 U.S. at 96–98, 106 S.Ct. at 1722–1723. In the event that the District Court believes that the City's peremptory challenges were racially motivated, it should order a new trial. If the Court

finds no racial motivation, the judgment will stand affirmed, subject, however, to plaintiff's right to appellate review of this finding of fact.

It is so ordered.